*Ariz. Beverages USA, LLC v. Hanover Ins. Co.*

## UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

### SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 2nd day of September, two thousand twenty-five.

PRESENT:

> DENNY CHIN,
> SUSAN L. CARNEY,
> RICHARD J. SULLIVAN,
> *Circuit Judges.*

_____

ARIZONA BEVERAGES USA, LLC,

> *Plaintiff-Appellee,*

v.                                                                  No. 23-1177

HANOVER INSURANCE COMPANY,

> *Defendant-Appellant.*

_____

For Defendant-Appellant:                      JEREMIAH L. O'LEARY (Robert M. Wolf, *on the brief*), Finazzo Cossolini O'Leary Meola & Hager, LLC, New York, NY.

For Plaintiff-Appellee:                      AMANDA PETERSON (Johnathan C. Lerner, *on the brief*), Lerner, Arnold & Winston, LLP, New York, NY.

Appeal from a judgment of the United States District Court for the Eastern District of New York (Gary R. Brown, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the August 30, 2023 judgment of the district court is **AFFIRMED**.

Hanover Insurance Company ("Hanover") appeals from a grant of summary judgment in favor of Arizona Beverages USA, LLC ("Arizona") as to Arizona's sole claim for breach of contract. On appeal, Hanover argues that the district court incorrectly interpreted various terms in Arizona's insurance policy to expand the policy's coverage to include audit expenses that Arizona incurred after a power surge caused a breakdown in its computer systems. We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal, to which we refer only as necessary in order to resolve this appeal.

## I.    Background

Hanover issued an insurance policy to Arizona for a coverage period spanning May 31, 2017 to May 31, 2018.   The "Equipment Breakdown Coverage Part" of the policy includes an "Extra Expense" provision, which states that Hanover will "cover only the extra expenses that are necessary during the 'restoration period' that [Arizona] would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from an 'accident' or 'electronic circuitry impairment' to 'covered equipment.'"   J. App'x at 213.   The policy elsewhere defines "restoration period" as "[t]he time it should reasonably take to resume [Arizona's] 'business' to a similar level of service starting from the date of a physical loss of or damage to property at a 'covered location' that is caused by a covered peril" and "ending on the date . . . the property should be rebuilt, repaired, or replaced" or "business is resumed at a new permanent location." *Id.* at 160.   Separately, the policy provides for a maximum coverage amount of $250,000 for "Data Restoration," *id.* at 119, *i.e.*, the "necessary cost to research, replace[,] and restore lost 'data,'" *id.* at 211–12, which in turn is defined as "information or instructions stored in digital code capable of being processed by machinery," *id.* at 210.

3

On October 29, 2017, Arizona experienced a power surge at its corporate headquarters in New York that damaged multiple disc drives and caused the failure of Arizona's accounting system. As a result, Arizona was unable to access its computer systems to see account balances, receivables, inventory, and order information. Arizona also suffered the loss of its financial data for 2016 and 2017. That loss of financial data jeopardized a credit agreement that Arizona maintained with JP Morgan Chase, N.A. ("Chase"), which required Arizona to submit to annual audits of its financial position to avoid default.

Days after the power surge, Arizona's independent auditor, Deloitte & Touche LLP ("Deloitte"), reached out to Arizona to begin its annual audit for the 2017 year, which was due by May 31, 2018. But as a result of the power surge and loss of financial data for that year, Arizona could not provide Deloitte with the information it typically used to complete an annual audit. To make up for the lack of information, Deloitte had to change its normal auditing procedures, resulting in an additional 2,200 hours of work above what Deloitte originally had quoted Arizona, and costing Arizona an extra $450,000. Arizona also incurred $86,455 worth of overtime pay for its employees to assist Deloitte with the audit. And because Deloitte was unable to complete the audit by the May 31 deadline,

4

Arizona was forced to spend $16,188.25 to extend that deadline in order to avoid default on its line of credit with Chase.

Arizona submitted a claim for the cost of the additional work performed by Deloitte, the overtime paid to Arizona employees, and the cost of the extensions, which totaled $552,573.25 (the "Audit Expenses"). Hanover, however, refused to reimburse Arizona for these expenses. Instead, it reimbursed Arizona the policy's stated maximum $250,000 amount for "data restoration" in connection with other expenses that Arizona incurred in attempting to recover its lost data.

On October 28, 2019, Arizona filed this suit for breach of contract, seeking to recover the Audit Expenses under the policy's Extra Expense provision. The district court granted summary judgment in favor of Arizona, concluding that the Audit Expenses were covered under the policy's Extra Expense provision because they were incurred during the "restoration period," when Arizona's "usual business operations" were interrupted as a result of the power surge. Sp. App'x at 7–8, 11–12. The district court determined that the restoration period began on the date of the power surge (October 29, 2017) and extended to the date that Deloitte completed its audit (October 24, 2018). Hanover timely appealed.

## II.    Legal Standard

When a federal court hears a state-law claim while sitting in diversity, the federal court is bound by the law of the state in which it sits.   *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78–80 (1938).   Under New York law, an insurance contract must be interpreted "to give effect to the intent of the parties as expressed in the clear language of the contract."   *Ment Bros. Iron Works Co. v. Interstate Fire & Cas. Co.*, 702 F.3d 118, 122 (2d Cir. 2012) (internal quotation marks omitted).   In determining the meaning of the contract, courts will consider extrinsic evidence only if the relevant contractual provisions are ambiguous.   *See Primavera v. Rose & Kiernan, Inc.*, 670 N.Y.S.2d 223, 224 (App. Div. 3d Dep't 1998).   However, if the terms of the policy remain ambiguous even after considering extrinsic evidence, courts construe the ambiguous terms in favor of coverage and against the insurer who drafted the policy.   *See id.* at 224–25.   Therefore, "[i]n order for the insurer to prevail, it must demonstrate not only that its interpretation is reasonable but that it is the only fair interpretation."   *Id.* at 225.

## III.    Discussion

We review *de novo* a district court's grant of summary judgment, construing "all the evidence in the light most favorable to the non-movant" and drawing "all

6

reasonable inferences in that party's favor." *McBride v. BIC Consumer Prods. Mfg. Co.*, 583 F.3d 92, 96 (2d Cir. 2009). Here, Hanover argues that the district court erred in concluding that the "restoration period" ended when Deloitte completed its audit on October 24, 2018. We disagree.

First, Hanover asserts that the "restoration period" should have ended on January 8, 2018, when Arizona's "covered equipment" was "repair[ed], replace[d], or rebuil[t]," *i.e.*, when Arizona replaced its damaged computer hardware and regained software functionality. Hanover Br. at 6–7. But the plain language of the Extra Expense provision does not tie the end of the restoration period to the repair, replacement, or rebuilding of "covered equipment." Instead, the policy defines the "restoration period" as "[t]he time it should reasonably take to resume . . . 'business' to a similar level of service starting from the date of a physical loss of or damage to *property* . . . and ending on the date: 1) the *property* should be rebuilt, repaired, or replaced; or 2) business is resumed at a new permanent location." J. App'x at 160 (emphases added). While "covered equipment" is a defined term in the policy that would likely exclude Arizona's financial data, the standalone term "property" is not. *See id.* at 209–21. Hanover's argument that "[r]epair or replacement of 'covered equipment,' not 'data,' was the terminus date

7

for the 'restoration period,'" Hanover Br. at 15, therefore finds no support in the text of the policy.

Critically, Hanover does not dispute that the lost financial data constituted Arizona's "property" under the ordinary meaning of that term. *See, e.g.*, *Property*, Black's Law Dictionary (11th ed. 2019) ("Collectively, the rights in a valued resource such as land, chattel, or an intangible."); *cf. Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 292–93 (2007) (holding that "electronic records that [are] stored on a computer and [are] indistinguishable from printed documents" are "subject to a claim of conversion"). Nor does Hanover supply any convincing reason to question the district court's conclusion that Deloitte's "enhanced Audit procedures constituted a reasonable form of 'repairing, replacing, or rebuilding' the lost data." Sp. App'x at 11. That process involved "analyz[ing] additional types and forms of data" to "create[] a functional simulacrum of the lost data" sufficient to allow Deloitte to complete its audit, *id.* at 11–12, which was necessary for Arizona to "resume . . . 'business' to a similar level of service," J. App'x at 160.[1]

---

[1] Hanover argues that the district court erred in determining that conducting an annual audit is part of Arizona's "business," Hanover Br. at 15–16, which the policy defines as "the usual business operations occurring at 'covered locations,'" J. App'x at 157. But we agree with the district court that servicing its credit agreement with Chase forms a core function of Arizona's business conducted from Arizona's corporate headquarters, that enlisting Deloitte to conduct annual audits is an integral component of that function, and that there are no genuine disputes

8

Although Arizona's financial data could not be recovered in its original form, Deloitte's enhanced procedures effectively recreated, through resort to alternative sources, the constellation of information necessary to complete its audit – thereby "replacing" the lost data for purposes of the audit. *See Replace*, New Oxford American Dictionary (3d ed. 2010) (to "take the place of" or to "provide or find a substitute for").

Hanover insists that the policy's inclusion of bespoke provisions covering data loss demonstrates that the restoration period cannot be tied to Deloitte's efforts to recreate Arizona's lost financial data. But nothing in the plain language of the policy provides that the Data Restoration provision is the exclusive vehicle for policyholders to seek recovery for damages associated with lost data. And to the extent that the policy's inclusion of specific terms addressing data loss introduces ambiguity into whether the Extra Expense provision covers the cost of replacing Arizona's 2017 financial data, New York law requires us to interpret "any ambiguities . . . against the insurer and in favor of the insured." *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 37 N.Y.3d 552, 561 (2021) (internal quotation marks omitted). Since Hanover has failed to demonstrate that the standalone term

of material fact concerning these issues.

"property," as used in the definition of "restoration period," excludes Arizona's financial data, we are required to construe any structural ambiguity in the policy to find that such data are included.

Having concluded that Arizona incurred the Audit Expenses during the policy's restoration period, we agree with the district court that those expenses are covered under the Extra Expense provision. Under that provision, Hanover was required to cover "extra expenses that are necessary during the 'restoration period' that . . . would not have [been] incurred if there had been no direct physical loss or damage to property caused by . . . 'electronic circuitry impairment' to 'covered equipment.'" J. App'x at 213. Arizona incurred the costs of Deloitte's enhanced audit and paid overtime to employees assisting Deloitte with its audit only because of the power surge that resulted in the failure of Arizona's account operating system and the loss of its 2017 financial data. And without such data, Deloitte was unable to complete its annual audit by the May 31, 2018 deadline, which in turn required Arizona to pay to extend that deadline to avoid defaulting on its credit agreement with Chase. Avoiding default clearly makes these expenses "necessary," and they undoubtedly were only incurred because of the damage caused by the power surge. We thus agree with the district court that

the full amount of the Audit Expenses is covered under the policy's Extra Expense provision.

*     *     *

We have considered Hanover's remaining arguments and find them to be without merit.   Accordingly, we **AFFIRM** the judgment of the district court.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court